## STEINBERG v. UNITED STATES.

No. 11793.

Circuit Court of Appeals, Fifth Circuit.

June 12, 1947.

Rehearing Denied Aug. 11, 1947.

George Gordon Battle, of New York City, John A. Erhard, of Dallas, Tex., Francis L. Kohlman, of New York City, and Eugene Meacham, of Washington, D. C., for appellant.

William P. Fonville, Asst. U.S. Atty., of Dallas, Tex., and Robert B. Young, Jr., U. S. Atty., of Fort Worth, Tex., for appellee.

Before SIBLEY, McCORD, and LEE, Circuit Judges.

SIBLEY, Circuit Judge.

Alex Steinberg was tried, convicted and sentenced on an indictment in four counts which charged him as to his own income for the calendar year 1943, and that of his wife in community, with wilfully attempting to evade and defeat their income and victory taxes by filing false and fraudulent tax returns and concealing the true income and taxes contrary to Internal Revenue Code, § 145(b), 26 U.S.C.A. Int.Rev.Code, § 145(b); and with wilfully subscribing said false tax returns not believing them to be true, contrary to Internal Revenue Code, § 145(c), 26 U.S.C.A. Int.Rev.Code, § 145

(c). Forty-three errors were specified on taking appeal, but only a few of them are now insisted on, they being urged as errors in themselves, and as showing that the trial as a whole was not fair and impartial. To understand them a brief outline of the evidence is made.

Steinberg since 1933 was a broker in whiskies, and held in 1943 permits from the State of Texas to do that business, and to represent certain out-of-State distilleries. In 1943 he began under some arrangement to deal for or with Robert Gould, who controlled several distilleries and bottling plants; and Steinberg was given office space in Cincinnati, Ohio, in Gould's offices there. Steinberg in 1943 is shown to have handled whisky sales, in barrels and bottles, running above two million dollars, in about three-fourths of which Gould was concerned. Whisky was scarce, and almost any price could be obtained for it. In April, 1943, ceiling prices were fixed by OPA. The prices obtained by Steinberg were far above the ceiling prices. Usually the distillery or bottling plant was paid ceiling price by check or on its draft, and the excess price was separately paid to Steinberg, in whose name the sales were made, by checks which he indorsed and collected, or in cash. More than a million dollars were thus traced into his hands. He testified that he had only a commission, or a "finder's fee" in them, acting otherwise for the sellers or buyers, and had no interest in the excess prices. He testified that in the Gould transactions Gould insisted that this excess over what was collected by the distilleries or other sellers be paid over to him in cash only, and was so paid, some being paid in person and some sent by registered mail and express in greatly undervalued packages. The distilleries' books showed only the ceiling prices charged and collected by them and other lawful expenses, such as taxes and bottling charges. No regular book record was kept by Gould or Steinberg of the excess prices, and Gould gave him no receipts; Steinberg and the purchasers, however, had the sales contracts from which the full prices could be ascertained, and the checks and drafts also showed what was paid.

Steinberg's records, made by himself, showed fully and accurately his transactions in business other than in whisky, his travel and other expenses, and his commissions on strictly commission sales. He had a record also of "brokerage" earnings, put into the tax return under that name, in which most of the whisky sales were represented, and in which earnings beyond ordinary commissions were entered which he described as "finder's fees", that is, compensation for finding whisky for a purchaser or a purchaser for the seller. It is this item of the returns about which the controversy turns, the prosecution contending that the income thus received was many times that reported and not mere fees, but a share in or the whole of the excess price paid for the whisky both in the Gould transactions and in others, and that the income was thus grossly understated, and taxes evaded on each return in an amount exceeding $400,000.

It was also shown that in November, 1944, Gould was indicted for selling whisky above ceiling prices; and he sent for Steinberg, and gave him in cash some $292,000, in addition to $60,000 which he had just previously sent, and induced him to return the aggregate of some $352,000 as income earned by Steinberg in sales in 1943, but not realized till 1944, which returns Steinberg made. Gould was convicted on his trial, though he testified that he had received no excess sales money. Government investigators testified in the present case against Steinberg that in 1946 he had stated to them in his counsel's presence that he had with Gould a rough 50-50 split arrangement during 1943 and that what Gould turned over to him in November, 1944, was about Steinberg's part under that arrangement. Steinberg has since filed claim for refund for the heavy taxes he paid on this money under his 1944 returns.

The crucial questions for the jury were the credibility as a witness of Steinberg, and of Gould, who was offered as a witness by the defense, but who testified as he had in his own trial, that Steinberg had never paid him any excess sales money, nor had he given Steinberg the $352,000 in November, 1944; and the credibility of Steinberg as to his true interest in the sales which were not Gould transactions. There was some circumstantial corroboration of Steinberg as to his paying Gould cash money. There was much testimony and documentary evidence of the large sums that went into Steinberg's hands from the whisky sales.

1. It is urged that language used in argument by prosecuting counsel requires a new trial, though no motion for a mistrial was made, and no objection offered or ruling invoked save in one instance. In that instance, the defendant having put his general character in issue, counsel was discussing that evidence and said: "Is he a law abiding citizen? Let us look at the evidence in this case. He testified to you under oath that constantly for nearly a year he engaged in the largest black market operation of which you probably ever heard, making nearly a million dollars, at a time when this nation was in a splendid effort to avoid the catastrophe of wild inflation, in a situation where demand far exceeded supply and the price of whisky was just a small part of the whole; here is a man who cynically from the stand tells you he has violated the federal law every day for nearly a year, and would have the temerity to introduce witnesses to say he has the reputation for being a law abiding citizen." Objection was made that the defendant had not cynically admitted from the witness stand that he had violated the law every day during 1943. The court said, "Well, that is a deduction of counsel. We will just let the jury weigh it." The defendant had testified to his numerous acts in aiding Gould to sell whisky at what he knew were over-ceiling prices, to lending his own name, collecting the money, and paying it over to Gould in cash. He had said he had no concern in the price, whether over-ceiling or not. Counsel, in view of the federal law that all who aid and abet another in crime are principals, was justified in arguing as he did that Steinberg was on his own testimony guilty along with Gould, and that it was cynical to testify to these facts and disclaim any moral or legal responsibility. The statement that Steinberg violated the law every day was an exaggeration, but perhaps an allowable inference. The court

did not err in his ruling that the matter was to be weighed by the jury.

Other criticisms of the prosecution's speeches are not supported even by objection. The speeches are reported in full, and appear to us to be logical and not inflammatory, and not exceeding in vigor what the nature of the case authorized.

2. Unfairness is attributed to the district attorney in asking Steinberg, "As a matter of fact you did not have your defense until your Washington lawyers got down here and got ready to try this case, did you?" No objection was made and the witness answered quietly, "You are absolutely mistaken in that." The question was asked after the witness had said that his tax attorneys in Washington had advised him to ask refund of the 1944 tax, and that he was not going to give it back to Gould. He had said the $352,000 so taxed belonged to the persons who had paid it as over-ceiling price. This newly advanced idea of refund to them seems to be the defense meant. The question caused no excitement at the time and should not now.

3. Error is assigned in the fining for contempt of the Washington counsel, which though not in the presence of the jury is argued to have been known to them, and to have disconcerted the counsel. It occurred thus. The counsel wished to prove that certain investigating agents of the government, apparently investigating Gould, had said to Steinberg, "We know you did not get the money. We want you to tell us about Gould." The court ruled the evidence not binding on the United States as an admission. There was then an effort to show that a microphone had been placed in Steinberg's hotel room, probably by these agents. The judge said, "We are going to warn counsel now not to seek to inject something indirectly that the court has ruled inadmissible; if you do so you do it under the court's warning." The finding of the microphone was then related by the witness, with wires leading to an adjoining room. The witness was asked who had occupied that room. On objection, the court said, "If he has got anything in here he ought to have, and the government has been guilty of wrongdoing, we might as well know it, and if not we might as well

understand counsel is seeking unethical procedure." The jury was sent out and the court said: "All right the bars are down and the gate is open; bring out all you have in mind, counsel." The matter of the microphone was pursued, but without showing that anything affecting Steinberg's case was learned therefrom. Then the witness was again asked about the agents' saying, "We know that you did not get the money and we know that Gould got it." The court asked counsel on what theory of law this was admissible. Counsel argued (the jury being still absent) that in such matters agents' reports were the basis of government action, and that the finding of the microphone was the cause of Steinberg's refusal to make further statements to the agents. The court, quietly but with his mind evidently on the agents' statement which he had previously ruled out, reprimanded the counsel and fined him $50 for contempt of court, expressing the opinion that "A lawyer of your ability could scarcely be in good faith in asking these questions." The jury was recalled and the case proceeded without further reference to the incident until the close of the evidence several days later when, the jury again being absent, the court of his own motion remitted the fine. For counsel intentionally to try to get before the jury evidence which the court has ruled out may well be a contempt in some circumstances, but here the jury was absent and the court invited counsel to go fully into the matter, and to state his theory of admissibility. There was no contempt of the former ruling, but only a doing of what the court invited. But this erroneous dealing with the counsel in the absence of the jury was not error in the trial. We cannot assume, as we are asked to do, that the jury learned of it and were unduly affected by it. Nor is there anything to show that counsel was by the injustice done him disabled in any way from doing his duty. It appears in the record that he is a retired naval captain, who has practiced law since 1915, and has served in the judge advocate's office in the Navy and as a penal trial attorney for the Bureau of Internal Revenue for five years. His sensibilities ought not to be unusually delicate. He made no claim to be disconcerted. He

continued to conduct the trial with his accustomed vigor and skill.

■■■ 4. The defendant offered to prove in addition to a good character in general, and for honesty and accuracy in business, that he was charitable. This trait was ruled out as not relevant to the case. In so ruling the court said, "I think in a certain book, Gone With the Wind, one of the most charitable persons in there was of bad ·reputation otherwise." On objection to the remark, the court told the jury he intended no personal application to Steinberg and to disregard ·it. The remark was out of place, but we think it was cured by its withdrawal. The ruling on the evidence offered was correct.

Other things are brought forward as showing hostility by the judge. These rulings as such were not erroneous. The report of the trial shows the judge ruling for one side about as often as the other. We are not impressed that there was any general hostility to the defendant or his counsel.

5. Robert Gould was present at the trial. The prosecution having rested, it announced that it would not use him as a witness. Defendant's counsel asked the court to call him as the court's witness. The court recognized the right to do so, but said he did not at the present stage feel called on to do it. The counsel for defendant then said, "We will call Robert Gould." The jury was retired on request, and it was made known by the district attorney that Gould had before the grand jury claimed his constitutional privilege against self-incrimination and refused to testify; he suggested that the court in the absence of the jury ascertain what questions were to be asked and whether the privilege covered them. Defense counsel desired that it all be done in the jury's presence. The court held that Gould should be allowed to claim his privilege in the jury's presence, but that the court would see presently how far the privilege might protect against the questions to be asked. This was done. The counsel for Gould who was present then arose and stated he had previously ⸱ ʟvised Gould to claim his privilege, but he would now like to advise him to answer any question which the court orders him to answer.

The jury then returned. Gould answered all questions asked him without making any claim of privilege at all, denying that Steinberg had paid him any of the over-ceiling price money as Steinberg claimed. The defense was allowed to impeach him by proof that he had nevertheless been convicted and sentenced for forty-eight OPA violations in liquor sales.

■■ We have recognized the right of the court in a criminal trial to examine an ·important witness whom neither side would vouch for, allowing both sides the privilege of cross-examination and impeachment. See Young v. United States, 5 Cir., 107 F. 2d 490. But it is a matter in the discretion of the court to do or not to do. There was no error in refusing. The defendant then voluntarily called this witness, apparently expecting that he would in the jury's presence refuse to testify on the ground that it would tend to incriminate him, affording an inference that he had received the over-ceiling price money. We do not, however, say that such an inference would be allowable. The witness testified just as he was known to have done in his own trial before another court. There was thus no entrapment, and impeachment was perhaps not really the right of the party calling him, but it was allowed. The disappointment of the defense at the conduct of the witness generates no error in the court's refusal to call him as the court's witness.

■ 6. Steinberg testified that Gould would take no checks but required cash for the over-ceiling money, and would give no receipts for it. Evidence was offered to corroborate him by showing by five or six other persons who at about this time had paid Gould over-ceiling prices for whisky that he dealt the same way with them. The court held that if Gould were on trial such similar transactions could be proved to show a plan or to illustrate Gould's intent and system; but with Steinberg on trial for a different offense Gould's dealings with others were res inter alios acta, and irrelevant. The evidence offered did not go to the extent that Gould had a rule or uniform practice of business, but only that he had required cash of those customers. There may have been others who were dealt with otherwise. An endless enquiry

might be opened up. For the purpose for which it was offered, we think the evidence not relevant.

7. As to the $352,000 which Steinberg testified Gould gave him in the fall of 1944 and requested him to return it as Steinberg's income earned in 1943 but not returnable then because subject to be reclaimed as over-ceiling money, evidence was allowed that Steinberg's own counsel advised him that this would be proper, but evidence was rejected that a counsel of Gould also so advised him. The distinction the court took was that a man might rely on what his own counsel advised him, but not on what another's counsel said. All this advice was given many months after the returns for 1943 had been made and sworn to, and could have no bearing on the good faith or belief in which they were made. It would bear only on the 1944 returns if they had been the basis of the prosecution. Whether over-ceiling money ought as a matter of law to be returned in the year is passed into the taxpayer's hands as his own, or whether because it might be reclaimed by the payer or the Administrator it is to be considered like embezzled funds which are not gain at all, is a question of law and not of ex post facto advice. The court could have been called on to decide it, if important to this case. We find no error in ruling out the opinion of Gould's lawyer expressed in November, 1944.

8. The defendant's counsel submitted to the judge some written requests for instructions to the jury. The judge did not inform him of his proposed action on them prior to the argument to the jury as required by Rule of Criminal Procedure 30, 18 U.S.C.A. following section 687. The record shows no request by counsel for this information, but that the requests were mentioned only after the charge and in connection with exceptions to their not having been given. There was an effort to have the record corrected to show a request for information before argument, but the judge did not remember any request and said he would have responded if asked, and that in fact he marked them all refused except as covered by the charge; and he refused to certify to any request. That we accept as final. The substance of most of the requests indeed appears in the charge. Some ought not to have been given. No argument is made as to error in refusing any, though a general specification of error was made in taking the appeal. None of them seems to us to be of a sort that would have affected the argument if it had been known that it would not be given. The irregularity in the judge's omitting to say before the argument what would be done about the requests does not seem to us to be error in the absence of a request to know. If error, it is here of an inconsequential sort and ought not to set aside the trial.

There is abundant evidence to justify the verdict. Since we find no reversible error in the trial, the judgment is affirmed.