**Ex parte Robert ROSE.**

**No. 69265.**

Court of Criminal Appeals of Texas, En Banc.

May 16, 1984.

Rehearing Denied Feb 26, 1986.

Jim Vollers, Austin, for appellant.

Henry Wade, Dist. Atty., and Gregory S. Long, Asst. Dist. Atty., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

■ This is an original application for writ of habeas corpus filed in this court in which the applicant, an attorney and an officer of the court, seeks relief from a judgment of the Criminal District Court No. 2 of Dallas County holding him in contempt of court.[1]

Applicant alleges he is illegally confined and restrained of his liberty by an order of contempt entered on January 30, 1984, in Cause No. F83–A0472MI by the Honorable Don Metcalfe, judge of the aforesaid district court, and assessed a fine of $500.00. Applicant contends the said contempt order is improper and void.

It appears that applicant was representing the defendant in said Cause No. F83–A0472MI who was charged with rape, and that applicant was held in contempt for asking the prosecutrix on cross-examination "in substance if she had been raped before." Prior to the said interrogation, the court had entered an order for the applicant to comply with V.T.C.A., Penal Code, § 22.065.

The respondent judge has been asked to respond and he has. The record is now before this court.

On January 23, 1984, prior to the voir dire examination of the jury panel, the record reflects the court called the applicant's attention to § 22.065 of the Penal code and stated:

"... This is an indictment charging the Defendant with the felony offense of rape and under that particular section of the Penal Code as it is now numbered. I want to caution you, Mr. Rose, that you

---

1. In contempt proceedings there is no remedy by appeal. *Ex parte Cardwell,* 416 S.W.2d 382 (Tex.1967); *Arnold v. State,* 493 S.W.2d 801 (Tex.Cr.App.1973); *Ex parte Moorehouse,* 614 S.W.2d 450 (Tex.Cr.App.1981). See also 13 Tex. Jur.2d, Contempt, § 62, pp. 270–271.

give strict compliance to that and that no questions are to be asked of the victim, alleged victim, and no evidence is to be offered in any way, going into prior sexual activity of the victim under that statute. First, advise the Court to retire the jury and outside the presence of the jury in a closed hearing, make it known to the Court your desires regarding going into such matters."

The prosecutor then informed the court a motion in limine along the same lines was being typed and asked it be granted. The court stated it would be granted.

The prosecutrix testified, as reflected by a stipulation by the parties for this record, that on February 27, 1982, she lived alone in a Dallas apartment; that after arriving home from work, she watched television, and then went to bed. About midnight she answered a knock at the door and found the defendant there. He asked for Barbara, her foster sister, who had formerly lived there. Since it was cold she asked him in, while she got Barbara's address and telephone number. They began to talk about Barbara and she smelled liquor on the defendant's breath. He asked if she had any "pot" and she answered "No," but said she would smoke a "joint." The defendant went to his car and returned. They then chatted and smoked a "joint." The prosecutrix observed he was "very drunk and high," and the defendant didn't want to "get back on the street in that condition." The prosecutrix finally agreed to drive him to a motel.

When she went to the bathroom, the defendant grabbed her from behind. He took her to the bedroom/living room and told her to commit oral sodomy on him. She felt a thin flat object in his pocket which could have been a knife. He told her he would cut her if she didn't do what he wanted. He forced her to commit oral sodomy on him and then he had sexual intercourse with her. After this he left. She drove to a hospital and called the police.

The transcription of the court reporter's notes reflects the following on the cross-examination of the prosecutrix:

"By Mr. Rose:

"Q You say you bought a gun after this?

"A Yes, sir.

"Q And you got a peep-hole installed?

"A Yes.

"Q I take it nothing like that ever happened to you before?

"MR. PHILLIPS (Prosecutor): Object strenuously to that . . . ."

"THE COURT: I sustain the objection. Ladies and gentlemen, would you go back in the jury room, please. (Whereupon, the jury was retired and the following proceedings were had outside the presence and hearing of the jury.)

"THE COURT: Mr. Rose, before this trial started I went over the Penal Code with you. I pointed out what it says about the prior sexual conduct of a victim of a rape case. And I told you at that point in time that you could not inquire into that without going into chambers and having a sealed, closed meeting that was under our law, closed to the public. Before I say anything more, have you got any good reason to explain to me why you would ask this witness if she had, in essence, ever been raped before?

"MR. ROSE: Judge, I understand that to be her promiscuity as related to promiscuity and the prosecutor brought up the fact about the gun, he brought up the fact about the peep-hole—

"THE COURT: No, your question to her, has anything like this ever happened to her before.

"MR. ROSE: I was not talking about promiscuity—

"THE COURT: You are talking about if she's ever been raped before, right?

"MR. ROSE: I am asking her, yes, sir.

"THE COURT: All right.

"MR. ROSE: Has nothing to do with sexual conduct regarding promiscuity or sexual conduct—

"THE COURT: That, Mr. Rose, may be decided by somebody else but you are in contempt of Court and your punishment is fixed at a five hundred dollar fine: I will hold this in abeyance pending the end of the trial. At the end of the trial I will enter an order, give you your rights and have you certified to the Presiding Judge and let you have your personal bond. We are going to take a ten minute recess and if this happens again during the course of this trial, after all the admonishments I have given you, I will deal with it again. Do you understand what I'm saying?

"MR. ROSE: Yes, sir. Judge—

"THE COURT: You take the next ten minutes to go read the Code of Criminal Procedure and the Penal Code and specifically the article in the Penal Code dealing with this evidence, because as far as I'm concerned, you are in direct violation, not only in this statute but by my order in this whole matter...."

■ Thereafter on January 30, 1984, after a hung jury and a mistrial, the court entered a written order of contempt for intentionally asking the question "I take it nothing like that ever happened to you before?" as the question was a direct inquiry as to whether the witness had been raped previously, and was in violation of V.T.C.A., Penal Code, § 22.065, and the previous order of the court. The fine assessed was $500.00. On the same date the respondent judge entered another order suspending the order of contempt and releasing applicant on his personal recognizance, and forwarding the matter to the Honorable John Ovard, Presiding Judge of the First Administrative District, for further proceedings in accordance with Article 1911a, V.A.C.S.[2] On February 6, 1984, the said Presiding Judge assigned the Honorable David Moore, a retired district judge, to the said Criminal District Court No. 2 to hear the contempt matter. On the same date a show cause order was issued and served on the applicant.

On February 10, 1984, the applicant appeared with his attorney before Judge Moore for the hearing before another district judge as contemplated by Article 1911a, V.A.C.S. Thereupon the applicant voluntarily withdrew his request for a hearing before another district judge to determine his guilt or innocence of contempt for acts committed before Judge Metcalfe on January 23, 1984.

Judge Moore then ordered the matter returned to Judge Ovard, Presiding Judge of the Administrative District, for transfer to Judge Metcalfe of the said Criminal District Court No. 2 for further proceedings pursuant to the original order of contempt.

■ On February 10, 1984, Judge Ovard returned the matter to Judge Metcalfe for further proceedings pursuant to the original order of contempt. Applicant then sought relief by filing this original application for writ of habeas corpus, and applicant has been released on his personal bond pending the disposition of this matter and until further order of this court.[3]

**2.** Article 1911a, § 2(c), V.A.C.S., provides in part:

"(c) Provided, however, an officer of a court held in contempt by a trial court, shall, upon proper motion filed in the offended court, be released upon his personal recognizance pending a determination of his guilt or innocence by a judge of a district court, other than the offended court. Said judge to be appointed for that purpose by the presiding judge of the Administrative Judicial District wherein the alleged contempt occurred."

An attorney representing his client in the trial of a case is an officer of the court, *Ex parte Howell,* 488 S.W.2d 123 (Tex.Cr.App.1972), and is under the provisions of Article 1911a, V.A.C.S. *Ex parte Pink,* 645 S.W.2d 262 (Tex.Cr.App. 1982).

**3.** The State appears to argue that since the applicant waived his right under Article 1911a, § 2(c), supra, to a hearing before another district judge to determine his guilt or innocence of the contempt, he is foreclosed from bringing this habeas corpus action. We do not agree.

Applicant argues that the order of contempt is void in that there is no evidence to support the respondent judge's conclusion that the question propounded to the prosecutrix was intentionally posed, and further there was no violation of the mandate of V.T.C.A., Penal Code, § 22.065.

He calls attention to the colloquy with the court following the asking of the question, that he understood the court's order and § 22.065 to refer to sexual conduct— that is promiscuity on the part of the prosecutrix, and not as to whether she had been the victim of a previous rape, the conduct of another individual. See, V.T.C.A., Penal Code, § 21.02 (1974) (now see § 22.011, effective Sept. 1, 1983).

V.T.C.A., Penal Code, § 22.065, provides:

"(a) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct may be admitted under Sections 22.011 and 22.021 of this code only if, and only to the extent that, the judge finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.

"(b) If the defendant proposes to ask any question concerning specific instances, opinion evidence, or reputation evidence of the victim's sexual conduct, either by direct examination or cross-examination of any witness, the defendant must inform the court out of the hearing of the jury prior to asking any such question. After this notice, the court shall conduct an in camera hearing, recorded by the court reporter, to determine whether the proposed evidence is admissible under Subsection (a) of this section. The court shall determine what evidence is admissible and shall accordingly limit the questioning. The defendant shall not go outside these limits nor refer to any evidence ruled inadmissible in camera without prior approval of the court without the presence of the jury.

"(c) The court shall seal the record of the in camera hearing required in Sub-section (b) of this section for delivery to the appellate court in the event of an appeal.

"(d) This section does not limit the right of the state or the accused to impeach credibility by showing prior felony convictions nor the right of the accused to produce evidence of promiscuous sexual conduct of a child 14 years old or older as a defense to sexual assault, aggravated sexual assault, or indecency with a child. If evidence of a previous felony conviction involving sexual conduct or evidence of promiscuous sexual conduct is admitted, the court shall instruct the jury as to the purpose of the evidence and as to its limited use." [Added by Acts 1975, 64th Leg., p. 477, ch. 203, § 3, eff. Sept. 1, 1975. Renumbered from § 21.13 (Penal Code) and amended by Acts 1983, 68th Leg., p. 5315, ch. 977, § 4, eff. Sept. 1, 1983.]

Appellant argues that the term "sexual conduct" is not defined for the purpose of the statute, nor is the term defined elsewhere in the Penal code or the Code of Criminal Procedure. Appellant stated he has been unable to find any case where this court has intimated that an assault upon a person by another individual involves *conduct* by the person assaulted, whether sexual in nature or otherwise. He calls attention to the fact that conduct is defined in V.T.C.A., Penal Code, § 1.07(a)(8), as meaning "an act or omission and its accompanying mental state." and he further argues that whether a person has been raped, or assaulted in any other manner, does not involve an act or omission with an accompanying mental state on the part of that person, the victim of the assault. Appellant thus contends his asking of the question did not violate § 22.065, supra.

We understand appellant's argument, but given the history of the statute, its forerunner § 21.13, and the purpose of the statute to be served, we do not give the term "sexual conduct" as used in § 22.065 the limited meaning urged by appellant. The term should be given its normal meaning and common usage.

V.T.C.A., Penal Code, § 1.05 (Construction of Code), provides:

"(a) The rule that a penal statute is to be strictly construed does not apply to this code. The provisions of this code shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code.

"(b) Unless a different construction is required by the context, Sections 2.01, 2.02, 2.04, 2.05, and 3.01 through 3.12 of the Code Construction Act (Article 5429b–2, Vernon's Texas Civil Statutes) apply to the construction of this code."

Section 2.01 of Article 5429b–2, V.A.C.S. (Code Construction Act), provides:

"Words and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

The term "sexual conduct" has not been statutorily defined nor has it acquired a technical meaning by case or decisional law or otherwise.

Black's Law Dictionary, DeLuxe Fourth Edition, defines "conduct" as "personal behavior; deportment; mode of action; any positive or negative act." Random House Dictionary of the English Language, Unabridged Edition, 1967 defines "conduct" as "personal behavior; way of acting; deportment," and defines "sexual" as "of or pertaining to sex; sexual matters."

The definition of "conduct" in V.T.C.A., Penal Code, § 1.07(a)(8), "an act or omission and its accompany mental state" is no more specific. It does not state that a "culpable" mental state must accompany any "conduct" whenever that term is used in the Penal Code. Nor does it state that you cannot have "conduct" without a mental state.

Reading the phrase or term "sexual conduct" in the context in which it is used in § 22.065 and in accordance with common usage, we hold that it encompasses sexual activity or conduct whether willingly engaged in or not, including situations where the "victim" to whom § 22.065 is applicable was involved in a prior rape offense, alleged offense or situation. Conduct is conduct, whether it's voluntary, involuntary, initiated by the victim, or initiated by another and involuntarily accepted or participated in by the victim. See and cf. *Stone v. State,* 574 S.W.2d 85, 89 (Tex.Cr.App. 1978).[4]

It is clear from a reading of the statute, its purpose[5] and the spirit of the law itself that a prior rape is "sexual conduct" of the victim, even though it is initiated by another and then involuntarily engaged in by the victim.

We reject applicant's argument the propounding of the question to the prosecutrix in the instant case was not a violation of the mandate of the statute (§ 22.065) and the trial court's order. The applicant, an attorney and an officer of the court, could easily perceive the thrust of the statute, and knew or should have known from the beginning that he was skating on thin ice. If he had needed clarification, he could have easily approached the bench outside the jury's hearing. He chose instead to ask a question of the prosecutrix which he acknowledges was an inquiry of whether she had been raped before. He took a chance and lost. We find no merit in his contention that he did not intend to violate the order of the court or § 22.065.

Applicant further contends that before contempt will lie for violation of a court order, the order must spell out the details of compliance in clear, specific and unambiguous terms, so that such person will readily know exactly what duties or obli-

---

4. In *Stone* this court wrote:
    "The mother's testimony regarding instances of sexual abuses by other persons is evidence of the victim's prior sexual conduct." See also *Johnson v. State,* 651 S.W.2d 434, 436 (Tex.App.—Dallas—1983, No PDR).

5. See generally 9 Texas Tech Law Review, Vol. 9, pp. 563, 576–578 (1978); Baylor Law Review, Vol. 31, p. 317 (1979).

gations are imposed upon him. He cites, inter alia, *Ex parte Smiley*, 626 S.W.2d 817 (Tex.App.1981); *Ex parte Slavin*, 412 S.W.2d 43 (Tex.1967); *Ex parte Ballard*, 632 S.W.2d 660 (Tex.App.1982). He then argues the trial court's order was susceptible of more than one construction and ambiguity and thus was not legally enforceable. Applicant also advances the previous argument as to the meaning of "sexual conduct" which we have already rejected. We find no merit in appellant's contention.

To establish "contempt" of court, it is not the purpose or intent to act which controls, but the act itself must be such as amounts to contempt of court. *Ex parte Bailey*, 142 Tex.Cr.R. 582, 155 S.W.2d 927 (1941); *Ex parte Dowdle*, 309 S.W.2d 458 (Tex.Cr.App.1958); *Ex parte Jacobs*, 664 S.W.2d 360 (Tex.Cr.App.1984). The essence of "contempt" is that the conduct obstructs or tends to obstruct the proper administration of justice. *Ex parte Salfen*, 618 S.W.2d 766 (Tex.Cr.App.1981).

Under the circumstances presented we do not find the court abused its discretion in finding the applicant guilty of contempt.

The relief prayed for is denied.

TEAGUE, J., dissents.

## ON REHEARING

Appellant's motion for rehearing denied without written opinion.

CLINTON, J., concurs.

TEAGUE and MILLER, JJ., dissent.

CLINTON, Judge, concurring.

We decided to grant applicant leave to file his motion for rehearing, presumably to examine his vigorous contentions that not only was it inappropriate for the Court to depart from germane provisions in the Penal Code and resort to dictionary defini-

tions to determine "common usage" of the term "sexual conduct," but also that having done so the Court came to the wrong conclusion. While I believe appellant may have a point or two, the majority avoids discussing them by simply overruling his motion for rehearing without written opinion, thereby adhering to the opinion on original submission.

There is some merit to the contentions because on original submission the Court looked more for the common meaning of "sexual conduct" than for what meaning the Legislature intended to give the term *"victim's* sexual conduct" as used in context of § 22.065.[1] Granted the opinion refers to "the history of the statute, its forerunner § 21.13, and the purpose of the statute to be served"—an endeavor that all but concedes the term "victim's sexual conduct" is ambiguous—yet it does not examine those matters in great depth. For reasons about to be given, it is not all that apparent to me the Legislature favored such construction and the consequences it risks.

In the first place, the opinion on original submission alludes to *Stone v. State*, 574 S.W.2d 85 (Tex.Cr.App.1978). The offense in *Stone* is sexual abuse of a child; accused proffered testimony showing "prior sexual abuse of the [child] by her father and uncle," purportedly to rebut testimony concerning psychiatric care for the child after the offense. Without any reference to former article 21.13 or citation of authority, the Court did indeed say such testimony is "evidence of the victim's prior sexual conduct," but found that it was unavailable as a defense under former § 21.10(b) of the Penal Code since the victim was less than fourteen years old, and thus the proffer "could not have been germane to any fact issue in the case concerning appellant's guilt or innocence," *id.*, at 89–90;[2] it com-

---

1. All emphasis is mine throughout unless otherwise indicated.

2. Denouncing sexual abuse of a child, former § 21.10(b) provided a defense to prosecution if the victim was at least fourteen and prior to the offense had "engaged *promiscuously* in sexual

intercourse or deviate sexual intercourse." Though the particular abuse involved appears to have been nonconsensual, see *Stone*, at 88, the opinion seems to equate prior sexual abuse of a victim with "promiscuity" on the part of the

pares *Young v. State,* 547 S.W.2d 23 (Tex. Cr.App.1977).

In *Young v. State,* supra, the Court noted § 21.13 was not followed (presumably because trial occurred shortly after its effective date), but found evidence of "the prosecutrix's prior sexual behavior," including engaging in sexual intercourse the night before the offense on trial and an earlier abortion, was "not germane to the issue of the victim's acquiescence, or any other issue raised by the evidence," *id.,* at 25; thus failure to comply with the statutory procedure was of little moment.

One might mention *Wilson v. State,* 548 S.W.2d 51 (Tex.Cr.App.1977). While a hearing was conducted, the Court opined that the matters (treatment for venereal disease, previous sexual intercourse and using oral contraceptives) were "not germane to the issue of the victim's acquiescence, or any other fact at issue as required by Sec. 21.13, supra," see *Young* "and cases there cited." [3]

Those three prior opinions do not even pretend to analyze the meaning of "victim's sexual conduct." *Stone* simply says prior sexual abuse of the victim by others is, suggesting erroneously that sexual abuse also shows "promiscuity;" *Young* and *Wilson,* however, deal with voluntary sexual conduct (or its consequences) on the part of the victim. They contribute little or nothing to resolution of the central issue in this cause.

---

victim. For me and I venture most parents, that notion is wholly unacceptable.

**3.** They are *Campbell v. State,* 147 Tex.Cr.R. 192, 179 S.W.2d 547 (1944) and *Tyler v. State,* 145 Tex.Cr.R. 315, 167 S.W.2d 755 (1942). Both regard *Graham v. State,* 125 Tex.Cr.App. 210, 67 S.W.2d 296 (1933), as a leading case that collects the law on admissibility of "victim's sexual conduct," and it is helpful to note that in each instance her prior conduct was voluntary. Nothing in any of the three opinions indicates evidence of past "sexual abuse of victim" is admissible. See also *Satterwhite v. State,* 113 Tex.Cr.R. 659, 23 S.W.2d 356 (1929).

**4.** To better comprehend the points Weddington sought to make about this legislation one must follow the format of her presentation. Earlier

Secondly, the opinion of the Court finds it "clear from ... the statute, its purpose and the spirit of the law itself that a prior rape is 'sexual conduct' of the victim"— "even though ... involuntarily engaged in by the victim." The "spirit of the law" reflects a societal interest in protecting the victim in a sexual abuse case. Since § 22.065 is derived from former § 21.13 and it in turn is from the "Weddington package," Acts 1975, 64th Leg., Ch. 203, p. 476, § 3 at 477–478, there can be no doubt that its "protection" was part and parcel of objective of H.B. No. 284, *viz:* "to make it less difficult to obtain convictions in sexual offense cases," *Hernandez v. State,* 651 S.W.2d 746, 752 (Tex.Cr.App.1983). Still, there is nothing in the legislative history to indicate that Weddington or any other member of the Legislature contemplated "victim's sexual conduct" be interpreted to include "sexual abuse of victim." To the contrary, the entire thrust of the original bill she cosponsored was to advance dual propositions, *viz:*

"The authors of the bill felt that, except where such conduct pertains to the issue of consent, the victim's past *sexual activity* is irrelevant to the question of whether or not a crime was committed. Even where consent is an issue, *only particular acts, not the woman's entire sexual history* would be relevant to consent to intercourse with a particular individual."

Weddington, *Rape Law in Texas: H.B. 284, And the Road to Reform,* 4 Am.J. Crim.Law 1, at 11 (Winter 1975–1976).[4]

---

at page 6 she outlines relevant provisions of the original bill under the italicized heading "G. *Victim's previous sexual conduct.*" It would have forbidden evidence of and any references to the victim's previous sexual conduct unless in an in camera hearing the trial court found it came within certain limitations of time and was relevant. *Inter alia,* she explains that the proposal was "careful to preserve the right of the defendant to impeach the victim's credibility by showing *any prior felony convictions involving sexual conduct on her record.*" (That right is retained in § 21.13(d).)

Then, under "Part II. Development of the Final Bill," by subject matter Weddington explains why sponsors made certain concessions, what was deleted and how the original proposal was modified; it is while making such explana-

Only after going through all those developments does Weddington set out in full the section that was ultimately added as § 21.13. Then she evaluates that section: "strongly worded in favor of excluding most of the victims' sexual activity—even more so than our original proposal," adding:

> "Attempted use of innuendo by defense counsel may be inevitable, but section 21.13 mandates the judiciary to control it and to warn the jury against it. If certain *acts by the prosecutrix* are relevant, they are admissible."

Nowhere in her exhaustive treatment of problems, proposals, legislative developments, respective arguments, rationale and evaluation does Weddington identify any kind of "sexual abuse of victim" as a concern; nor does she claim that it is intended to be embraced within the meaning of "victim's sexual conduct;" nor does she assert that the legislation actually includes it.

Thirdly, the legislative process thus produced the matters covered by § 21.13, *viz:*

> "(a) Evidence of *specific instances of the victim's sexual conduct, opinion evidence* of the victim's sexual conduct and *reputation evidence* of the victim's sexual conduct may be admitted . . ."

Facially, those provisions simply cannot reasonably be read to make "sexual abuse of victim" a form of "victim's sexual conduct." Nor will an analysis of that essential component of the statutory phrase permit such a reading. For purposes of the penal code "conduct" means "an act and its accompanying mental state," § 1.07(a)(8). Putting "sexual" before it as an adjective modifies "conduct" to identify its quality. Use of the possessive case makes the

phrase mean "the victim's sexual act with an accompanying mental state"—"victim's sexual conduct."

When "material to a fact at issue" such evidence of the latter goes to "propensity" of a victim to engage in consensual sexual intercourse and, some say, credibility. Comment, *Forcible Rape: The Law in Texas,* 9 Tex. Tech L.Rev. 563 at 575 (1978); Comment, *Limitations on the Right to Introduce Evidence Pertaining to the Prior Sexual History of the Complaining Witness in Cases of Forcible Rape: Reflection of Reality or Denial of Due Process?* 3 Hofstra L.Rev. 403, 409 (1975); see also Comment, *Rape—Admissibility of Victim's Prior Sexual Conduct: What is the Law in Texas?* 31 Baylor L.Rev. 317 (1979). In those instances where the prosecution introduces certain physical evidence, the accused is allowed to show such prior consensual sexual intercourse as may tend to explain the condition of her "private parts" after the alleged rape. *Id.,* at 319, 326–327; *Bader v. State,* 57 Tex.Cr.R. 293, 122 S.W. 555, 556–557 (1909); *Campbell v. State,* 147 Tex.Cr.R. 192, 179 S.W.2d 547, 549 (1944); see *Roper v. State,* 375 S.W.2d 454, 456 (Tex.Cr.App.1964). Neither law review article discussing § 21.13, nor the Hofstra Comment surveying the subject generally, remotely suggests that evidence of "sexual abuse of victim" is part of the problem or any way implicated in solving it.

To find that it does include "sexual abuse of victim" turns § 22.065 on its head and creates a risk that *evidence of specific instances* of sexual *abuse* of victim, *opinion evidence* of sexual *abuse* of victim and *reputation evidence* of sexual *abuse* of victim *will* get to a jury on an illadvised

---

tions that she comes to the "most divisive issue retained in the final bill"—"the extent to which information relating to a woman's *past sexual conduct* should be permitted by law." *Weddington,* op cit., at 11. She then relates how "authors of the bill *felt*" about that issue, as quoted in the text above. Weddington goes on to support their "feeling" by, *inter alia,* arguing from a proposition laid down ninety years earlier by Judge White in *Wilson v. State,* 17 Tex.App. 525, 536 (1885), that opponents to the proposal were wrongheaded.

That done, Weddington provides a rationale for § 21.13, *viz:*

> "The accused enjoys many protections during the course of his prosecution, including the inadmissibility of *his own past sexual behavior—even if other women have previously accused him of rapes or rape attempts.* In voting to add section 21.13 . . ., a majority of House members asserted that irrelevant testimony about the victim's past at trial did not meaningfully protect the defendant." *Id.,* at 12–13.

finding by a trial court. The risk is great enough that under the Act consequences of the construction given the statute by the majority must be taken into account. Code Construction Act, § 311.022, V.T.C.A. Government Code, 10 Vernon's Texas Session Law Service 1985, 3247. Yet there is no real indication they have been. It is a wry construction of a statute designed to be protective of a victim of sexual abuse that may force her to reprise sexual abuses previously perpetrated against her. That risk ought not and need not be created.

Section 22.065 is essentially a procedural device to shield a testifying victim of sexual abuse—a sort of statutory order *in limine*. It places on attorney for accused a burden of first realizing that a proposed question pertains to the victim's sexual conduct and then informing the trial judge of an intent to ask it. However, § 22.065 does not purport to be an exclusive procedure to initiate a hearing to bar inadmissible evidence of victim's sexual conduct. A motion *in limine* is still available to prosecutors. *Weddington*, op cit., at 13. Indeed, since it should be more conducive to a better understanding of what is verboten than a unilateral determination by counsel, as a practical matter a written motion *in limine* may well provide better protection than a statutory order.

For all those reasons the majority grievously errs in adhering to the construction of § 22.065 in the opinion on original submission, and I must dissent to its conclusion in this respect. Should the majority insist on enlarging scope and effect of § 22.065, surely it can cause the Court to frame a more definitive rationale than "[c]onduct is conduct," Maj.Op.P. 756.[5]

Turning to the result, it is not necessary that the Court apply so much judicial gloss to the statute in order to uphold the order of contempt in this cause. That order finds, *inter alia*, that applicant posed a question "intentionally ... in direct viola-

tion of the *provisions* of Article [sic] 22.-065, *supra, and* in direct violation of the *orders* of this Court on January 23, 1984 ..." The verbal order was couched in terms of "prior sexual activity." The stipulation reveals smoking a joint of marihuana, oral sex, attempted intercourse and actual intercourse. In that context broadly to ask a female complaining witness "I take it that *nothing like that* ever happened to you before?" reasonably anticipates that she might easily allude to prior consensual sexual conduct. Thus, should we agree with Judge Teague that the ensuing colloquy may not serve to define breadth and substance of the question, see his dissenting opinion at pp. 754–755 and 756, and still in light of all surrounding circumstances a judge may infer from its breadth and substance that the question does trespass into forbidden territory.

As I understand it, the majority has concluded that the verbal *order* was clear and certain enough to authorize the trial court to render its order of contempt after finding applicant in violation. In his own opinion Judge Teague agrees the verbal order has the same force and effect. Dissenting opinion, p. 756. On that basis much said in the opinion about § 22.065 becomes dicta, and need not be written at all.

Also, on the same basis, the Court may leave open the question of whether a criminal defense lawyer engages in contemptuous conduct merely on a bare failure to comply with § 22.065(b), although the opinion on original submission seems to answer it affirmatively. Creating such uncertainty is not too helpful to the bench and bar. I would hold that, without more, a failing to conform with § 22.065(b) is not contemptuous *per se*.

Given my own views of the matter and my understanding of the way this cause is being resolved, I reluctantly join the judgment but not the opinion of the Court.

5. The term fashioned by the majority is a solecism, saying at once everything and nothing at all. See *Almanza v. State*, 686 S.W.2d 157, 166 (Tex.Cr.App.1985). Fortunately for victims of sexual abuse, by restoring a shield Rule 412, Texas Rules of Criminal Evidence captures more of the spirit of the original legislation. What is done today will soon pass away.

TEAGUE, Judge, dissenting.

I am compelled to dissent to the majority's decision overruling applicant's motion for rehearing without written opinion because I find from the record before us that Robert Rose, a Dallas attorney, is not guilty of contempt of court for asking the complaining witness in the case in which he was defending, Donald Lee Creager, who was accused of raping the complaining witness in that cause, the following question: "I take it nothing like *that* ever happened to you before?" [My emphasis.]

The majority opinion on original submission, in sustaining the trial judge's order of contempt, actually emasculates part of the Sixth and Fourteenth Amendments to the Federal Constitution and part of Art. I, Sec. 10, of the Texas Bill of Rights, which give an accused person the right to confront and cross-examine the State's witnesses.

I strongly suggest to every law student who aspires to become another Richard "Racehorse" Haynes of the criminal defense bar to carefully read the majority opinion. After doing so, I suspect that many of those persons will immediately cast their eyes in another direction as to what field of law they might desire to practice after they leave law school.

The record *before us* reflects that prior to trial, but without any reason shown why such occurred, the trial judge admonished Rose in the following manner, which I have copied verbatim from the record: "I have had one or two conferences in chambers with the lawyers relative to two things; the first of which is division of Penal Code, what is currently Section 22.065, evidence previous sexual conduct. This is an indictment charging the Defendant with the felony offense of rape and under that particular section of the Penal Code as it is now numbered, *I want to caution you, Mr. Rose, that you give strict compliance to that and that no questions are to be asked of the victim, alleged victim, and*

*no evidence is to be offered in any way, going into prior sexual activity of the victim under that statute.* First, advise the Court to retire the Jury and outside the presence of the Jury in a closed hearing, make it known to the Court your desires regarding going into such matters...." [My Emphasis.][1] Rose, however, was not ordered not to ask the specific question that he asked the witness, for which he stands convicted of contempt of court.

The record also reflects that during the in camera judicial hearing the trial judge was notified by one of the prosecuting attorneys that the State was going to file a written motion in limine, "somewhere along those lines [referring to the above admonishments that the trial judge gave Rose]...." The prosecutor also made it known to the trial judge that he would seek, through his written motion in limine, an order prohibiting Rose from making "any references to drugs or drug usage by the victim," to which the trial judge responded: "Mr. Rose can certainly go into the res gestae of the offense but as to prior sexual activity he has to comply with the statute. I will extend that [the motion in limine] to prior drug activity if it's not part of the res gestae." Whether the trial judge actually approved the State's written motion in limine is not revealed by the record before us, nor is the written motion in limine in the record before us.

The majority opinion on original submission states and holds that the above oral statements of the trial judge were sufficiently "clear and unambiguous" to put Rose on notice that he was prohibited from asking the complaining witness the following question: "I take it nothing like that ever happened to you before?" I disagree.

The trial judge found Rose guilty of contempt after concluding that the question Rose had asked the witness was "a direct inquiry as to whether the witness had been raped previously." I also disagree with this erroneous conclusion.

1. By analogy, the statements of the trial judge closely resemble the meaning of a yellow traffic light; such does not inform a motorist that he must come to a complete stop, it only means that the motorist should proceed with caution and care.

The record reflects that prior to Rose asking the complaining witness what is now determined to have been a contemptuous question, the complaining witness had testified to the following, which comes to us from a stipulation between Rose's present counsel and the assistant district attorney who now represents the State: [2]

The record reflects that the following occurred when Rose was cross examing the complaining witness: [3]

The meaning of the fatal question that Rose asked the complaining witness clearly escapes ascertainment or, at least, is so obscure as to be subject to numerous interpretations; thus, the question asked cannot be fairly construed to have been in violation of the trial judge's pretrial "cautionary" instructions. Especially is this so when one tries to determine what Rose was referring to when he used the word "that" in his question, which actually compounds the ambiguity.

I find that everything that Rose stated to the trial judge during the above colloquy [4] resulted from an invitation by the trial judge for Rose to explain why he thought that the question he had asked the witness was a proper question. Rose actually attempted to give his reasons but, as the record clearly reflects, the trial judge did not even give him the opportunity to intelligently state his reasons why he had asked the question. The record clearly reflects that in almost every single instance when Rose attempted to give his reasons for asking the question he was cut off by the trial judge.

Regardless how one might construe what occurred during the colloquy, such is nevertheless immaterial and irrelevant in deciding whether Rose is guilty of contempt of

court for asking the witness the above question. It is now axiomatic in our law that it was improper for the trial judge and it would be improper for this Court to use any of Rose's statements that he might have made during the colloquy that occurred in order to support the trial judge's finding that Rose was in contempt of court, for the simple reason that he was then doing only what the trial judge had invited him to do—to give his reasons why he had asked the question. See *Steinberg v. U.S.*, 162 F.2d 120 (5th Cir.1947), cert. denied, 332 U.S. 808, 68 S.Ct. 108, 92 L.Ed. 386 (1947). The die that caused the trial judge to find Rose guilty of contempt had already been cast and the colloquy cannot be used to support the trial judge's finding that Rose was guilty of contempt for asking the above question, which is the only reason that is given for holding that Rose is guilty of contempt of court.

In *Ex parte Slavin*, 412 S.W.2d 43 (Tex. 1967), the Supreme Court of Texas stated the guidelines to be followed in determining whether a court order is definite and certain enough to support a finding of contempt. The requirements are as follows: the order must spell out the details of compliance in clear, specific, and unambiguous terms so that the person who may be held in contempt will readily know exactly what duties or obligations are imposed upon him. Also see *Ex parte Hodges*, 625 S.W.2d 304 (Tex.1981).

In *Ex parte Duncan*, 42 Tex.Cr. 661, 62 S.W. 758 (Tex.Cr.App.1901), this Court stated the following: "Where the court seeks to punish either by fine, arrest, or imprisonment for the disobedience of an order or command, such order or command must carry with it no uncertainty, and must not be susceptible of different meanings or

---

**2.** The stipulation is attached to this opinion as "Appendix A."

**3.** This excerpt from the record is attached to this opinion as "Appendix B."

**4.** The colloquy closely resembles a motorist learning that he had been confronted with what he thought was a yellow caution light rather than a red light, in that Rose learned through

the colloquy that the question he had asked the witness fell within the purview of the trial judge's "cautionary" admonishments. See *ante*. It was only through the colloquy that Rose learned that the "traffic light" that he had just approached was a red light, rather than a yellow caution light. The record before us reflects that thereafter Rose obeyed all of the remaining "red traffic lights" with which he was confronted.

constructions, but must be in the form of a command, and, when tested by itself, must speak definitely to the meaning and purpose of the court in ordering." If the court order itself fails to spell out the details of compliance in clear, specific, and unambiguous terms as to the act or acts that are to be performed, or are not to take place, then the order will not support a judgment of contempt. Also see *Ex parte Gorena*, 595 S.W.2d 841 (Tex.1979); *Ex parte Padron*, 565 S.W.2d 921 (Tex.1978).

The pretrial order in this cause is a punitive order and must be considered in that light. There also must be no doubt from the record that Rose intentionally and wilfully violated it before he can be found guilty of contempt for asking the above question. See *Ex parte Jones*, 331 S.W.2d 202 (Tex.1960); *In re Rumaker*, 646 F.2d 870 (5th Cir.1980); *Com. of Pa. v. L.U. 542, I.U.Op.Engrs.*, 552 F.2d 498 (3rd Cir.1977).

In this instance, Rose did not ask the complaining witness whether she had been raped before, as the trial judge erroneously found and the majority opinion erroneously states; nor did he ask her in substance if she had been raped before, as the trial judge erroneously found and as the original opinion in this cause erroneously stated; nor did he ask her about her previous sexual conduct, as the majority opinion erroneously holds. Instead, he asked the witness the following question: "I take it nothing like that ever happened to you before?" What does the use of the word "that" refer to? In this instance, the use of the word "that" could have many meanings, in light of what the record reflects had previously occurred. The record does not reflect what Rose's next question might have been or in which direction he was then headed when he was interrupted by the prosecuting attorney's objection.

The question that must be answered is not what the statute might mean, why it was enacted, what meaning certain words and terms of the statute might have, or the like, as the opinion on original submission implies. The question, instead, is whether Rose violated the trial judge's pretrial "or-

der" in one of the following ways: (1) advising the jury of specific instances of the witness' prior sexual conduct; (2) advising the jury in general of the witness' prior sexual conduct, (which is what V.T.C.A., Section 22.065 prohibits an attorney asking a victim); or (3) advising the jury in general about the witness "prior sexual activity," which is what the trial judge in this cause actually cautioned Rose not to ask the witness about until a hearing had been held outside of the jury's presence on the propriety of such a question.

It is now elementary law that a trial judge possesses the authority and power to establish rules and give instructions governing the trial of a cause, and, in the absence of a showing that such are null and void, an officer of the court is duty bound to abide by them even if the rules and instructions are later found to be erroneous. Thus, in this instance, the trial judge's pretrial "order," that Rose was not to question the witness about her "prior sexual activity" until he had ruled on the issue outside of the jury's presence, was effective, whether correct or not, and the controlling question is whether or not Rose violated this "order."

The trial judge's "order," under our contempt law, must be strictly construed, and it may not be enlarged or broadened by construction and inference. *Ex parte Jones*, 331 S.W.2d 202 (Tex.1960). In this instance, the majority opinion violates the latter principle by bootstrapping the colloquy into the question in order to bring the question within the purview of the trial judge's pretrial cautionary admonitions. This is impermissible. *Steinberg v. United States*, supra.

I find that the question that is before us, whether Rose is guilty of contempt of court, is not even a close one. Based upon the record before us, and the applicable law, the question should be answered in the negative.

This is *not* a case where the trial judge ruled that a specific question was not to be asked and the attorney persisted in asking the question. Cf. *Ex parte Fisher*, 206

S.W.2d 1000 (Tex.Cr.App.1948), affirmed, *Fisher v. Pace*, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569, rehearing denied, 336 U.S. 928, 69 S.Ct. 653, 93 L.Ed. 1089 (1949). Nor does the record reflect that Rose conducted himself with other than dignity and the proper attitude when he was cross-examining the complaining witness and when he addressed the trial judge. He asked the witness what he thought was a proper question, but which the prosecuting attorney thought was an improper and objectionable question. Whether the prosecution attorney's objection was ever ruled upon by the trial judge is not reflected by the record before us.

In light of what is before us, to hold Rose in contempt of court on this record for merely asking the above question is itself contemptuous.

In closing, I am compelled to agree with what Rose's present counsel, Hon. Jim Vollers, a former member of this Court, has stated: "[I]f this court's ... decision is allowed to stand, the power of contempt has been tremendously broadened in this State. From this point forward an attorney who violates a Motion in Limine, no matter how innocently or inadvertently he acted, and no matter how broadly the motion is drawn, is subject to a contempt finding by the trial court ... Furthermore, no matter how vague the order [or how ambiguous the question asked might be], conduct can be made criminal which could not be reasonably foreseen to have been criminal by the party involved."

For all of the above reasons, I respectfully dissent.

## APPENDIX A

The first State's witness at guilt/innocence was Donna Kay Lewis Johnson, the complaining witness in the rape case. She testified that on February 27, 1982, she lived alone at 5815 Tremont, Dallas County, Texas, in an apartment.

She testified that she got off work at 5:00 p.m. that day. Later in the evening at 9:00 p.m. she watched T.V. Then at 10:15 p.m. she went to bed. At 12 midnight, there was a knock at the door. Ms. Lewis got up and answered the door. She opened the door and saw the Defendant Creager standing there. The man asked her if "Barbara" was there. Barbara was her foster sister. She told him that she wasn't there but that she had her address and phone number. Barbara had lived there before, according to Ms. Lewis.

Ms. Lewis asked the Defendant if he wanted to come in since it was cold and she couldn't find Barbara's address. She wrote the address down and laid it beside him. Ms. Lewis noticed liquor on his breath. They began to talk about Barbara. He asked her if she had any pot, and she said, "No." He said he did, and he asked her if she wanted to smoke a joint. She said, "Yes." Then he reached into his pocket to pull it out, said he left it in his car and needed to get it. He got it and came back in. They chatted and smoked the joint. She testified that he was real drunk and high and said he didn't want to get back on the street in that condition. She told him she agreed with him. He asked if she'd take him to a motel, and she asked him to leave. She testified that he insisted she take him to a motel, and she, still thinking he was a friend of Barbara's, agreed to take him to a motel.

As Ms. Lewis continued, she stated she went to the bathroom, reached for the light in the bathroom, and the Defendant came up behind her and grabbed her. She testified she sank to the floor and said, "Oh, my God." He picked her up and threw her across the kitchen. He said she knew what he wanted. She said that by that time he was taking her into the bedroom/living room. It was an efficiency apartment. He told her that he wanted her to "suck his dick." She said, "No," and he then said, "Yes." She said she shook her head no and he grabbed her by her waist. Her knees went to the floor. He undid his pants and she was still resisting. With his hand, he reached into his pocket and said, "I'll hurt you if you don't do this." She testified she was scared and thought he might have a weapon in his pocket. When he said that, she testified she stopped re-

sisting. She then did what he wanted and put her mouth on his penis. He held her up to him. Ms. Lewis felt a thin flat object in his pocket, she testified. It could have been a knife. As she cried and pleaded with him to stop, he told her he would make her do it one way or the other. He told her he would cut her if she didn't do what he wanted. Then he forced her on to the bed, took the remainder of his clothes off, tried to put his penis in her vagina, but could not because he could not get an erection. She testified he made her perform oral sex on him, saying it was necessary for him to get an erection. She did it, he got an erection, then he penetrated her, entered her vagina, and had intercourse with her—his penis penetrated her vagina.

During the sexual intercourse, she testified she began to resist. He said that if she didn't help him get an erection, he would get his "nigger."

After the sex, he got up, put his clothes on, picked his cigarettes off the table and left. She bolted the door after him. She was numb. She testified she then put her clothes on and drove to the hospital. She told the nurse she'd been raped. The police were called.

## APPENDIX B

BY MR. ROSE:

Q. You say you bought a gun after this?

A. Yes, yes.

Q. And you got a peep-hole installed?

A. Yes.

Q. I take it nothing like that ever happened to you before?

MR. PHILLIPS: Object strenuously to that ...

THE COURT: I sustain the objection. Ladies and gentlemen, would you go back in the Jury room, please.

(Whereupon, the Jury was retired and the following proceedings were had outside the presence and hearing of the Jury:)

THE COURT: Mr. Rose, before this trial started I went over the Penal Code with you. I pointed out what it says about the prior sexual conduct of a victim of a rape case. And I told you at that point in time that you could not inquire into that without going into chambers and having a sealed, closed meeting that was under our law, closed to the public. Before I say anything more, have you got any good reason to explain to me why you would ask this witness if she had, in essence, ever been raped before?

MR. ROSE: Judge, I understood that to be her promiscuity as related to promiscuity and the prosecutor brought up the fact about the gun, he brought up the fact about the peep-hole—

THE COURT: No, your question to her, has anything like this ever happened to her before.

MR. ROSE: I was not talking about promiscuity—

THE COURT: You are talking about if she's ever been raped before, right?

MR. ROSE: I am asking her, yes, sir.

THE COURT: All right.

MR. ROSE: Has nothing to do with sexual conduct regarding promiscuity or sexual conduct—

THE COURT: That, Mr. Rose, may be decided by somebody else but you are in contempt of Court and your punishment is fixed at a five hundred dollar fine. I will hold this in abeyance pending the end of the trial. At the end of the trial I will enter an order, give you your rights and have you certified to the Presiding Judge and let you have your personal bond. We are going to take a ten minute recess and if this happens again during the course of this trial, after all the admonishments I have given you, I will deal with it again. Do you understand what I'm saying?

MR. ROSE: Yes, sir. Judge—

THE COURT: You take the next ten minutes to go read the Code of Criminal Procedure and the Penal Code and specif-

ically the article in the Penal Code dealing with this evidence, because as far as I'm concerned, you are in direct violation, not only in this statute but by my order in this whole matter. We will take ten minutes and then we will start up.

Whereupon, this concludes all of the requested excerpts had in the hearing in this cause.)